**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Global Sports Management GmbH, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | No. 1:24-cv-08118 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| Fres William Oquendo, | ) | |
| | ) | |
| Appellee. | ) | |

**MEMORANDUM OPINION AND ORDER**

Fres William Oquendo filed a petition for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois. *See In re Oquendo*, No. 1:19-bk-04127 (Bankr. N.D. Ill.). Oquendo then initiated an adversary proceeding against Global Sports Management GmbH ("Global") and several other parties for breach of contract. *See Oquendo v. Global Sports Management GmbH*, No. 1:19-ap-00106 (Bankr. N.D. Ill.). Global moved for summary judgment in the adversary proceeding. The Bankruptcy Court (J. Baer) denied Global's motion for summary judgment and *sua sponte* granted partial summary judgment to Oquendo. The parties now appeal various decisions in that action. For the reasons discussed below, certain of those appeals are dismissed for lack of jurisdiction and the remaining appeals are denied.

**Factual Background**

**A. The Bout & the Agreements Governing the Bout**

A title boxing bout between Oquendo and Mahmoud Charr was scheduled to take place on September 29, 2018, in Cologne, Germany (the "Bout"). AD-ECF 103 at ¶ 9; AD-ECF-146 at ¶ 9. Oquendo's promoter, POW Sports Entertainment, Inc. ("POW"), and Charr's promoter, Global, entered into a "Heads of Agreement" (the "HOA") on or about April 11, 2018, under which Global

agreed to promote the Bout. *See* AD-ECF 103 at ¶ 3; AD-ECF-146 at ¶ 3.[1] Oquendo and Charr each executed a "ratification and consent," which bound them to all terms and conditions of the agreement (the "Ratification"). AD-ECF 1-1, Ex. 1 (HOA) at 6. Pursuant to the Ratification, Oquendo agreed "to look solely to POW for full payment of any amounts due for all rights granted and services performed by [Oquendo] thereunder [the HOA], except with respect to [his] purse as provided in Paragraph 2(a)(i) of [the HOA] which [was] to be paid by [Global]." *Id*. Paragraph 2(a)(i) of the HOA provided, in pertinent part, that "[Global] shall enter into a local bout agreement with Oquendo . . . to pay Oquendo a purse for his participation in the Bout of $50,000 . . . [to be] wire[] transferred by [Global] to a bank account designated by Oquendo no later than the second banking day after the Bout . . ." HOA at ¶ 2(a)(i).

Among other relevant provisions of the HOA, Paragraph 1 states, in pertinent part, that "POW shall provide . . . the services of Oquendo . . . for the Bout" and "[Global] shall be responsible for providing the services of Charr for the Bout." *Id*. at ¶ 1. Paragraph 1 also provides that "POW will cause Oquendo to comply, and [Global] will cause Charr to comply, with the WBA's rules prohibiting the use of performance enhancing drugs and the WBA's Fair Boxing Program," which is administered by the Voluntary Anti-Doping Association ("VADA") "with respect to antidoping testing for the Bout." *Id.* Paragraph 5 of the HOA contains *force majeure* and personal incapacity clauses, providing that:

> In the event the Bout is prevented from taking place by reason of any act of God, fire, flood, riot, war, public disaster or any other cause beyond the direct and immediate control of [Global], or if Oquendo or Charr shall be or become disabled or incapacitated by reason of any physical or mental disability, injury

[1] "BK-ECF" refers to documents electronically filed on the docket for the lead bankruptcy case, No. 1:19-bk-04127; "AD-ECF" refers to documents electronically filed on the docket for the adversary proceeding, No. 1:19-ap-00106; and "ECF" refers to documents electronically filed on this Court's docket. Though, as discussed below, the parties have designated all documents filed on both the lead bankruptcy and adversary dockets as part of the record of the adversary proceeding on appeal, the distinction between the two cases is pertinent for purposes of this Court's appellate jurisdiction.

> or illness which prevents or interferes with his or their participation in such bout as scheduled, and a duly licensed physician shall certify that Oquendo or Charr cannot participate in the Bout on the Bout Date, then the WBA shall decide whether to postpone the Bout, in which event all of the provisions of this Agreement shall remain in full force and effect and shall apply to the rescheduled date of the Bout.

*Id*. at ¶ 5.

Paragraphs 3, 4, and 6 of the HOA additionally set out specific rights and obligations pertaining to the Bout, including that: "Oquendo's locker room shall be for his exclusive use and large enough to accommodate Oquendo [and his camp]" (*id.* at ¶ 3(c)); "Oquendo . . . shall have the right to use an unlimited amount of traditional soft surgical gauze . . . and an unlimited amount of traditional surgical adhesive tape required to protect [his] hands" (*id.* at ¶ 3(d)); "Oquendo . . . shall have the right to designate (1) member of his boxing team . . . to be present in the locker room of the other boxer to observe the wrapping of the hands of the other boxer and to inspect the gloves upon presentation by the WBA Supervisor" (*id.* at ¶ 3(d)); and "Oquendo shall have the right to have signage on ring apparel" (*id.* at ¶ 6). Additionally, "[Global] agree[d] to furnish to Oquendo" various Bout tickets and credentials for his camp, access to a local boxing gym in Cologne, and ground transportation. *Id.* at ¶ 4.

Paragraph 10 of the HOA states, in pertinent part, that "the parties will enter into a more formal agreement containing the terms and conditions hereof and such other terms and conditions as are mutually agreed." Consistent with Paragraph 10, Oquendo, Global, POW, Square Ring, Inc. ("SRI"), Hitz Entertainment Corporation ("Hitz"), David Diaz, and the Law Offices of Leon R. Margules, P.A. ("Margules" or the "Escrow Agent"), executed an agreement (the "Escrow Agreement") under which Global agreed to place into escrow $275,000 for the Bout (the "Escrowed Funds"). *See* AD-ECF 1-1, Ex. 2 (Escrow Agreement) at ¶¶ 1-2. Recital B of the Escrow Agreement stated that, whereas "[t]he parties agreed that Global would place into escrow

the sum of US$275,000 payable to POW under the HOA for the Bout" and Recital C provided that "Oquendo, POW, SRI, [Hitz] and Diaz (the 'Oquendo Parties') have reach agreement as to the allocation and distribution of the Escrowed Funds among the Oquendo Parties."

Paragraph 3 of the Escrow Agreement provides that, "[u]pon the conclusion of the Bout, the Escrowed Funds shall be distributed to the Oquendo Parties upon either a) a writing from Global that the Bout has taken place or b) certification from any of the Oquendo Parties that Oquendo participated in the Bout, corroborated by a news article from Boxingscene.com that the Bout has occurred." Paragraph 3 goes on to provide that "[t]he Escrow Agent shall wire transfer the Escrowed Funds . . . as follows": (a) $196,250 to Oquendo; (b) $33,750 to SRI; (c) $25,000 to Hitz; (d) $20,000 to Diaz; and (e) no funds to POW. Paragraph 6 of the Escrow Agreement further provided, in pertinent part, that:

> If the Bout between Oquendo and Charr does not occur as currently scheduled and the Bout is not rescheduled as provided in Paragraph 5 of the HOA, Global shall provide a certification to the Escrow Agent that the Bout has been cancelled . . . and all of the Escrowed Funds shall be returned to Global, provided, however, notwithstanding any other provision of this Agreement, the Escrow Agent shall notify each of the Parties in accordance with Paragraph 16 below upon its receipt (i) of the Escrowed Funds and (ii) of each request . . . by a Party for the disbursement of Escrowed Funds. . . . If it is claimed that the event forcing cancellation was the responsibility of Global any such claim must be made in good faith and any objection must set forth the reason it is claimed that the cancellation is the responsibility of Global. Any such contention must be made in writing within 2 days following such notification.

Lastly, Paragraph 14 of the Escrow Agreement provides that, "[e]xcept for the HOA, this Agreement sets forth the entire agreement among the parties with respect to its subject matter, and supersedes and replaces all prior and contemporaneous warranties, representations, and agreements whether written or oral."

**B. Cancellation of the Bout**

On September 19, 2018, VADA reported an "adverse" result on Charr's "A Sample," the one of two urine specimens collected from Charr in Germany on August 31, 2018. *See* AD-ECF 103 at ¶ 10; AD-ECF 146 at ¶ 10. The German boxing commission suspended Charr pending resolution of the allegation that he had taken a performance enhancing drug ("PED"). *See* AD-ECF 103 at ¶ 38; AD-ECF 146 at ¶ 38. As a result of Charr's suspension, the Bout did not take place as scheduled on September 29, 2018. *See id*. On October 18, 2018, Oquendo's personal attorney sent a letter via email to the Escrow Agent and Global demanding payment of Oquendo's share of the Escrowed Funds, $196,250. *See* AD-ECF 103 at ¶ 15; AD-ECF 146 at ¶ 15; AD-ECF 103-4 at 5. The letter stated that, "the proposed bout was postponed and . . . not rescheduled," and so there was "no impediment to the payment of [the] funds demanded." AD-ECF 103-4 at 5. That day, Global's counsel, Patrick English, responded, asserting that the conditions for distribution as provided by the Escrow Agreement had not been met and that Global continued to discuss the possibility of rescheduling the Bout with POW. *See* AD-ECF 103-4 at 7.

**C. Global's Attempts to Proceed with the Bout**

On October 11, 2018, the second urine sample Charr provided, the "B Sample," was tested by VADA, without an expert of Charr's choosing present for the opening and testing of the sample. *See* AD-ECF 1-1 at 18; AD-ECF 141 at ¶¶ 8-10. Analysis of this sample also resulted in an adverse finding. *See* AD-ECF 1-1 at 18. On November 12, 2018, the WBA issued a resolution suspending Charr for six months for testing positive for certain prohibited substances. *See* AD-ECF 142 at ¶ 7. Charr then requested reconsideration. *See* AD-ECF 138-4; AD-ECF 142 at ¶ 8. Following administrative proceedings as to the validity of the testing procedure, on December 18, 2018, the WBA reinstated Charr and indicated that the Bout was to take place within sixty days. *See* AD-

ECF 103 at ¶ 16; AD-ECF 146 at ¶ 16; AD-ECF 1-1 at 22. Acknowledging that Charr did not have a representative attend the B Sample testing, the WBA recalled his suspension "[b]ecause of the lapse of time since the taking of the A and B Samples and the communication issues alleged by Charr." *See* AD-ECF 1-1 at 22. The WBA did not, however, find that the adverse result for either sample was a false positive. *Id*.

On February 11, 2019, English sent via email a standard WBA bout contract to John Wirt, counsel for POW, requesting Oquendo's signature by February 15, 2019. *See* AD-ECF 103 at ¶ 21; AD-ECF 146 at ¶ 21; AD-ECF 138 at ¶ 19; AD-ECF 138-9; AD-ECF 138-10. Oquendo did not sign the contract, and instead filed for bankruptcy. *See* BK-ECF 1. After learning of Oquendo's bankruptcy petition, English called Wirt, who agreed that POW would withdraw from participation with respect to the Bout and gave Global permission to communicate with Oquendo's personal attorney in an effort to "save" the Bout. *See* AD-ECF 103 at ¶ 24; AD-ECF 146 at ¶ 24; AD-ECF 138 at ¶ 22. English then sent an email to Oquendo's personal counsel offering to remove references to POW from the contract if Oquendo's "issue" was "solely one of working with his promoters." *See* AD-ECF 103 at ¶ 25; AD-ECF 146 at ¶ 25; AD-ECF 138-11 at 2. In response, Oquendo's attorney stated that Oquendo believed that the "prior contracts" were "no longer in force" as a result of the bankruptcy filing but that he was still willing to fight Charr as long as, among other things, the Bout went out for a new purse bid. AD-ECF 103 at ¶ 26; AD-ECF 146 at ¶ 26; *see also* AD-ECF 138-13 at 2.

Upon learning that Oquendo had "refused to sign a standard bid contract for the bout," on March 6, 2019, the WBA issued a third resolution concluding that Oquendo's failure to sign was a violation of the prior resolution. *See* AD-ECF 142-3. The WBA found that "the most recent impediment to carrying out the [December 18] Resolution [was] Oquendo, not Charr." *Id*. at 3.

Among other things, the WBA set forth a new set of requirements for Oquendo to satisfy in order to compete for the championship belt. *Id*. at 3-4.

**Procedural Background**

On February 15, 2019, Oquendo filed for bankruptcy. BK-ECF 1. On February 19, 2019, Oquendo filed the adversary action on February 19, 2019 against Global, POW, SRI, Hitz, Diaz, and Margules, alleging breach of the Escrow Agreement and seeking, *inter alia*, turnover of the Escrowed Funds. AD-ECF 1.

On March 22, 2019, SRI filed: (a) on the adversary docket, a motion to dismiss the adversary action, *see* AD-ECF 6; and (b) on the lead bankruptcy docket, a motion to dismiss Oquendo's bankruptcy petition, *see* BK-ECF 35. The respective memoranda supporting those motions are identical but for a handful of words indicating that the motion filed on the adversary docket is one to dismiss the adversary action. *Compare* AD-ECF 6 at 1 (SRI's "Motion to Dismiss *Adversary Proceedings*…"; SRI "requests that this Court dismiss Debtor's . . . complaint in *these adversary proceedings* . . ." (emphasis added)) *with* BK-ECF 35 at 1. Both motions argue that "[t]his Chapter 13 case should be dismissed on grounds that it has been filed in bad faith and for the improper purpose of rejecting an exclusive promotional contract." AD-ECF 6 at 26; BK-ECF 35 at 26. Global filed a notice of adoption of SRI's motion to dismiss the adversary action. *See* AD-ECF 17. On March 29, 2019, the Bankruptcy Court denied SRI's motion to dismiss the adversary action for reasons "stated on the record" during a hearing held that day and before the motion was fully briefed. *See* AD-ECF 24. Briefing on SRI's motion to dismiss Oquendo's bankruptcy petition occurred through May 2019. *See* AD-ECF 56 (opposition); AD-ECF 59 (reply). The Bankruptcy Court then held a trial on SRI's fully briefed motion to dismiss the bankruptcy petition in August, September, and November 2019. On November 12, 2019, the

Bankruptcy Court denied SRI's motion to dismiss Oquendo's bankruptcy petition on the merits. *See* BK-ECF 103; AD-ECF 146-1 at 24:14–28:3. This decision was entered on the docket for the lead bankruptcy case. *See* BK-ECF 103.

On April 26, 2019, SRI, Hitz, POW, and Diaz responded to the adversary pleadings, and asserted counterclaims, each seeking declaratory judgment that they are entitled to their share of the Escrowed Funds as outlined by the distribution provided for in Paragraph 3 of the Escrow Agreement; requesting that the Escrowed Funds be distributed according to Paragraph 3 of the Escrow Agreement or, in the alternative, that a resulting trust be imposed on their share of the Escrowed Funds; and ordering turnover of their share of the Escrowed Funds under 11 U.S.C. § 543. *See* ADE-ECF 34 (SRI and POW); AD-ECF 35 (Hitz); AD-ECF 36 (Diaz).

Also on April 26, 2019, Global filed a motion to dismiss the adversary proceeding for failure to state a claim and for *forum non conveniens*. *See* AD-ECF 33. First, Global argued that the Escrow Agreement does not supersede the HOA and that Oquendo does not have standing to enforce the HOA. *See id*. at 10-14. Second, Global argued that, pursuant to the forum selection clauses of the HOA and the Escrow Agreement, Cologne, Germany was the exclusive forum for actions, such as this one, brought by Oquendo against Global and arising from the HOA or the Escrowed Agreement. *See id*. at 14-15. Global did not move to dismiss on the basis that Oquendo's bankruptcy petition was fraudulent. *See generally id.* On April 9, 2020, the Bankruptcy Court denied Global's motion, holding that Oquendo had standing to enforce the HOA as a third-party beneficiary; and that, due to Oquendo's financial straits, it would be unreasonable to enforce the forum selection clause. *See* AD-ECF 63 at 3-5 (*forum non conveniens* ruling), 6-8 (failure to state a claim ruling). On May 26, 2020, Global filed its answer to the adversary pleadings, and did not assert any counterclaims. *See* AD-ECF 70.

On July 13 and 15, 2020, the Bankruptcy Court entered orders consolidating Oquendo's objections (the "Claim Objections") to creditor claims filed by SRI, Hitz, Diaz, and Global (the "Claims") in the lead bankruptcy case with the adversary action. *See* BK-ECF 166; BK-ECF 167. In particular, the Bankruptcy Court stated that it would hear and determine the Claim Objections as part of the Adversary Proceeding, but would enter the final orders required by 11 U.S.C. § 502(b) on the docket of the bankruptcy case. *See* BK-ECF 166 at ¶ 3; BK-ECF 167 at ¶ 3.[2] No findings as to the Claims or the Claim Objections have been made on the record of the adversary action; no final orders concerning the Claims or the Claim Objections have been entered into the record of the lead bankruptcy case; and a hearing concerning the Claim Objections is scheduled for October 23, 2026 in the lead bankruptcy case, *see* BK-ECF 387-390.

Following discovery, on July 25, 2022, Global moved for summary judgment in the adversary proceeding. *See* AD-ECF 101. Global argued that: (a) Oquendo was bound by the determination of the WBA; (b) Global had no control over Charr; (c) Oquendo has no claim on the Escrowed Funds; (d) Oquendo breached the HOA; (e) Global performed its obligations under the HOA and the Escrow Agreement; and (f) Oquendo's petition for bankruptcy was fraudulent. AD-ECF 102. Global submitted a statement of undisputed material facts, *see* AD-ECF 103; Oquendo moved to strike a declaration and exhibits filed in support of Global's statement of facts, *see* AD-ECF 118; Oquendo filed a response to Global's statement of facts, in which he disputed

[2] Claim 11 by SRI seeks $33,750 from Oquendo for "portion of monies in escrow belonging to creditor per escrow [agreement]"; Claim 12 by SRI seeks $18,125 for "TV rights from Charr bout"; Claim 13 by Hitz seeks $25,000 for "interest in escrowed bout"; Claim 14 by Hitz seeks $26,875 from Oquendo for "TV rights from Charr bout"; Claim 15 by Hitz seeks $220,000 for "breach of Promotional Agreement and Common Interest Agreement"; Claim 18 by Diaz seeks $20,000 from Oquendo for "interest in escrowed bout"; and Claim 19 by Global contains a rider in which Global expresses its disagreement with Oquendo's allegations in the adversary action. *See* BK-ECF 110; BK-ECF 111; BK-ECF 112; BK-ECF 113. No document filed on the adversary docket addresses TV rights or the "Promotional Agreement and Common Interest Agreement."

only two factual assertions, and a statement of additional facts, *see* AD-ECF 146; and Global did not file a response to Oquendo's statement of additional facts.

On August 23, 2024, the Bankruptcy Court denied Global's motion for summary judgment and *sua sponte* granted summary judgment to Oquendo. *See* AD-ECF 173. The Bankruptcy Court found that, in view of the fact that Oquendo disputed only two factual assertions in Global's statement of facts, that there was no dispute of material fact. *See id*. at 9-10. The Bankruptcy Court then determined that, as a matter of law: (a) Oquendo was not bound by the determination of the WBA; (b) Global had control over Charr; (c) Oquendo had a claim on the Escrowed Funds; (d) Oquendo did not breach the HOA; and (e) Global breached the HOA. The Bankruptcy Court stated that it had ruled on Global's argument concerning Oquendo's petition for bankruptcy "in Oquendo's favor in its prior decisions and will not revisit them here." *Id.* at 12 n. 19. The Bankruptcy Court additionally noted that Oquendo is entitled to only $196,250 of the total $275,000 in Escrowed Funds. *See id*. at 17 n. 22. Defendants SRI, POW, Hitz, Diaz, and Margules have not been dismissed from the adversary action and no judgments, summary or final, have been entered against them. The lead bankruptcy case is ongoing.

The parties have filed cross notices of appeal based on the Bankruptcy Court's August 23, 2024 decision in the adversary action under 28 U.S.C. § 158(a)(1). *See* AD-ECF 181; AD-ECF 181-2; AD-ECF 193. The parties did not seek leave to appeal that decision, and no appeal was certified by the Bankruptcy Court. Nevertheless, Global appeals the Bankruptcy Court's *sua sponte* grant of partial summary judgment to Oquendo; denial of its motion for partial summary judgment; denial of SRI's motion to dismiss due to Oquendo's alleged abuse of bankruptcy; and denial of Global's motion to dismiss the adversary action for *forum non conveniens*. Oquendo appeals the Bankruptcy Court's denial of his motion to strike; its denial of his evidentiary

objections raised in his brief in opposition to Global's motion for summary judgment; and its holding that he is only entitled to $196,250 of the Escrowed Funds. For the reasons discussed below, the Court dismisses Global's appeal of SRI's motion to dismiss and Oquendo's appeal insofar as it concerns the Claims and Claim Objections for lack of jurisdiction; and affirms the Bankruptcy Court's denial of Oquendo's motion to strike, denial of Global's motion to dismiss, denial of Global's motion for summary judgment, and grant of summary judgment in favor of Oquendo.

## Discussion

### I. Jurisdiction

"Jurisdiction is the first question in every appeal. . . Jurisdictional questions are pervasive in bankruptcy cases because of the tension between the 'finality' rule of § 158(d) and the fact that each bankruptcy proceeding contains many claims and problems, each of which may come to a final conclusion before the estate has been wrapped up." *In re Morse Elec. Co*., 805 F.2d 262, 264 (7th Cir. 1986). The Court's task here is made more difficult by both parties' failure to "investigate jurisdictional factors before appealing and explain those factors to the [Court]." *Id*. It is "[c]ounsel [who] must scrutinize the record and consider the cases to separate the appealable from the interlocutory; they may not automatically appeal, as [the parties] appear[] to have done, and hope that the problem will escape notice or that the judges will do all the work of separating interlocutory from final orders." *Id*. Notwithstanding the deficiencies in the parties' briefing, the Court finds that certain issues are properly before it.

#### A. Legal Standards

An adversary proceeding does not share complete identity with the bankruptcy case embracing it; rather, "the main bankruptcy case and adversary proceeding must be treated as

distinct for the purpose of appeal." *In re Cleveland Imaging & Surgical Hosp., L.L.C.*, 26 F.4th 285, 293 (5th Cir. 2022); *see also In re Financial Oversight and Management Board for Puerto Rico*, 52 F.4th 465, 482-83 (1st Cir. 2022) (similar); *In re Teknek, LLC*, 512 F.3d 342, 345 (7th Cir. 2007) ("For the purpose of appellate jurisdiction we treat adversary proceedings as if they were separate suits."). "A notice of appeal in a main bankruptcy proceeding cannot serve as notice of appeal in a related adversary proceeding," and vice versa. *Cleveland Imaging*, 26 F.4th at 293; *see also U.S. v. Peel*, 595 F.3d 763, 768-69 (7th Cir. 2020) ("An adversary proceeding is thus part of the bankruptcy but it is not the bankruptcy case itself, as illustrated by the fact that the dismissal of an adversary proceeding is an appealable final order even though the bankruptcy case continues.").

A federal district court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of a bankruptcy court under 28 U.S.C. § 158(a)(1). Federal Rule of Civil Procedure 58(a), made applicable to adversary proceedings initiated in a bankruptcy court by Federal Rule of Bankruptcy Procedure 7058, establishes a clear line for finality by providing that "[e]very [such] judgment . . . must be set out in a separate document." Nevertheless, the Seventh Circuit has held that, "[a]lthough [an] order does not comply with the requirements of Fed.R.Civ.P. 58, it [still may] sufficiently indicate[] [the lower court's] determination to be done with the case to constitute a final decision . . ." *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 331 (7th Cir. 1993) (discussing finality in context of 28 U.S.C. § 1291). The finality of an order does not provide automatic grounds for appeal where there are multiple claims or parties to an action. Under Federal Rule of Civil Procedure 54(b), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7054(a), "[w]hen an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court

may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."

However, finality for purposes of appeal under the Bankruptcy Code is "a less stringent [standard] . . . than that employed in most civil lawsuits." *In re Wade*, 991 F.2d 402, 406 (7th Cir. 1993). The Seventh Circuit has held that "orders wrapping up an adversary proceeding with respect to a single party might be appealable without findings under Rule 54(b)." *In re Berke*, 837 F,2d 293, 294 (7th Cir. 1988) (citing *Morse*, 805 F.2d at 264; *In re Wagner*, 808 F.2d 542, 544-45 (7th Cir. 1986)); *see also Morse*, 805 F.2d at 264 ("A disposition of a claim that would be final as a stand-alone suit outside of bankruptcy is also final under § 158(d) in bankruptcy.") (cited favorably by *In re McKinney*, 610 F.3d 399, 402 (7th Cir. 2010)). "When one creditor's position is finally determined, (subject to proration at the end of the case to reflect the amount of assets and other allowed claims)," *Morse*, 805 F.2d at 264, and all that "remains corresponds to the collection stage in an ordinary lawsuit," the disposition is "final" for purposes of Section 158(a), *Wagner*, 808 F.2d at 545. *See also Zedan v. Habash*, 529 F.3d 398, 402 (7th Cir. 2008) ("[T]he test we have utilized to determine finality under § 158(d) is whether an order resolves a discrete dispute that, but for the continuing bankruptcy, would have been a stand-alone suit by or against the trustee.").

The flexible approach to finality provided by Section 158 does not automatically apply to adversary proceedings. Rather, "[t]he more an adversary proceeding looks like an independent lawsuit, attached to a bankruptcy case only because someone happens to be bankrupt, the more we will insist on adherence to the norms of finality under § 1291 and Rule 54(b). But when . . . the adversary proceeding is a core proceeding to value a creditor's undisputed claim . . . a resolution of one creditor's full position is 'final' under § 158(d) without the need for a formal entry of a separate judgment under Rule 54(b)." *Morse*, 805 F.2d at 265; *see also Rosen v. AES/chase Bank*,

2015 WL 6756290, at *2 (N.D. Ill. Nov. 3, 2015) (citing *Morse* and applying norms of finality under Rule 54(b) and Section 1291 to "related," but "non-core," adversary proceeding).

**B. Analysis**

**1. Orders Made in the Lead Bankruptcy Case**

Both Global and Oquendo seek review of certain decisions made by the Bankruptcy Court in the lead bankruptcy case, rather than in the adversary proceeding. Oquendo appeals the Bankruptcy Court's "effective" rulings on the Claims and Claim Objections by virtue of its ruling on the issue of the distribution of the Escrowed Funds in its summary judgment decision entered on the adversary docket. Presumably in support of his arguments on this issue, Oquendo unilaterally designated the entire lead bankruptcy case docket as part of the record of the adversary proceeding on appeal. *See* ECF 9 at 29-74. Global "effectively" appeals the Bankruptcy Court's denial of SRI's motion to dismiss Oquendo's bankruptcy petition. Though Global argued in its motion for summary judgment in the adversary proceeding that Oquendo's bankruptcy petition was fraudulent, *see* AD-ECF 102 at 17-18, the Bankruptcy Court denied Global's motion on the basis that it had already decided this issue "in Oquendo's favor in [a] prior decision[] and will not revisit [it] here," AD-ECF 173 at 12 n. 19. That "prior decision[]" can only be the Bankruptcy Court's denial of SRI's motion to dismiss Oquendo's bankruptcy petition filed in the lead bankruptcy case. This is because, while SRI filed a motion to dismiss for abuse of the bankruptcy process in both the adversary action and the lead bankruptcy case, only the latter was fully briefed and decided on the merits.[3]

[3] The record designated by the parties on appeal is both under- and over-inclusive. While the parties designated all of the documents filed on the docket of the adversary proceeding, and Oquendo unilaterally designated the documents filed on the lead bankruptcy case docket, as part of the record on appeal, neither party complied with Federal Rule of Bankruptcy Procedure 8009(a) or (b), which requires that parties order "transcripts of such parts of the proceedings not already on file as the appellant considers necessary for the appeal." Specifically, neither party provided this Court

In other words, Global and Oquendo do not merely ask this Court to consider evidence put before the Bankruptcy Court in the lead bankruptcy case, but to review and reverse decisions made, on the merits, in that action. Even assuming that such review is possible on the record the parties have put before this Court, doing so would exceed the appellate jurisdiction of this Court.[4] While courts have taken wide-ranging approaches to the scope of the documents which may be properly designated as part of the record on appeal under Federal Rule of Bankruptcy Procedure 8009(a), *see Balke v. Carmichael*, 2019 WL 13191287, at *8-14 (S.D. Tex. Jul. 30, 2019), this Court is not aware of, and the parties do not identify, any authority providing that an interlocutory decision may be subjected to appellate review by the filing of a notice of appeal on the docket of a separate case, albeit a closely related one. Such a rule would fly in the face of the Seventh Circuit's holding that, "[f]or the purpose of appellate jurisdiction we treat adversary proceedings as if they were separate suits," *Teknek*, 512 F.3d at 345; and would all but destroy the principle of finality delimiting appellate jurisdiction. Here, the parties filed their notices of appeal in the adversary action, and the lead bankruptcy case is still ongoing. *See* AD-ECF 178. Seventh Circuit authority—and good sense—compels this Court to find that the parties' appeals pertaining to SRI's motion to dismiss Oquendo's bankruptcy petition and the Claims and Claim Objections are not within this Court's jurisdiction.[5] These appeals are dismissed.

---

with the transcript of the Bankruptcy Court's oral ruling denying SRI's motion to dismiss filed in the adversary proceeding.

[4] Neither party provided this Court with the complete transcript of the trial on SRI's motion to dismiss filed in the lead bankruptcy case—which would be necessary for this Court's review of the Bankruptcy Court's decision on that motion.

[5] The Court notes that part of the relief Oquendo seeks on appeal—"instruct[] [the Bankruptcy Court] to conduct hearings on pending claim objections," ECF 44 at 15—is already available to him. As discussed above, the Bankruptcy Court has scheduled a hearing on the Claim Objections for October 23, 2026.

**2. Orders Made in the Adversary Proceedings**

The parties' remaining appeals—the Bankruptcy Court's grant of partial summary judgment to Oquendo, denial of Global's motion for summary judgment, denial of Oquendo's motion to strike, and denial of Global's motion to dismiss—concern orders which, standing alone and in light of the other defendants named in the adversary action, are interlocutory. However, the Seventh Circuit has held that, "because we take a practical approach to finality . . . the characterization of the order a 'partial' summary judgment is not controlling for purposes of § 1291." *MedLegal Solutions, Inc. v. Premium Healthcare Solutions, LLC*, 166 F.4th 657, 666 (7th Cir. 2026) (cleaned up). That is to say, if the Bankruptcy Court's partial grant of summary judgment was intended to be a final judgment as to Global and Oquendo, then the parties' other remaining appeals are within this Court's jurisdiction; but if it was not so intended, then all of the remaining appeals, including the grant of partial summary judgment to Oquendo, must be dismissed as premature.[6] *See Taylor v. Brown*, 787 F.3d 851, 856 (7th Cir. 2015) (appeal from final judgment brings up for review any interlocutory orders that have not become moot).

The Court finds that the Bankruptcy Court intended its partial grant of summary judgment to constitute a final judgment as to the claim between Global and Oquendo. Taken together with its prior motion to dismiss ruling, *see* AD-ECF 63, the Bankruptcy Court's ruling on summary judgment resolved all matters between Global and Oquendo. That the Bankruptcy Court intended its order to be final is evidenced by its rulings on the amount of Escrowed Funds to which Oquendo is entitled, AD-ECF 173 at 17 n. 22, and Oquendo's claim for compensatory damages, costs, and attorney fees, AD-ECF 173 at 18 n. 24, issues not raised by either party in their summary judgment briefing. Global asserted no counterclaims against Oquendo; as such, "all that remains to be done

[6] Neither party has argued that these orders are capable of review under 28 U.S.C. § 1292.

on remand to make it final is a 'ministerial' ruling by the lower court"—namely an entry of judgment directing the Escrow Agent to distribute the Escrowed Funds. *In re XMH Corp.*, 647 F.3d 690, 693 (7th Cir. 2011); *see also Wagner*, 808 F.2d at 545.

Notwithstanding the finality of the Bankruptcy Court's grant of partial summary judgment to Oquendo, the Court must still consider whether the parties' appeal is precluded by their failure to move the Bankruptcy Court to enter a Rule 54(b) order finding "no just reason for delay." As discussed above, a final order in an adversary proceeding is appealable in the absence of a Rule 54(b) finding where (a) the adversary proceeding is a core proceeding and (b) the order resolves a creditor's full position. The Bankruptcy Court determined that this adversary proceeding is a core proceeding under the catchall provisions of 28 U.S.C. § 157(b)(2), (A) (administration of the estate) and (O) (other proceedings affecting the adjustment of the debtor-creditor relationship). *See* AD-ECF 173 at 1. The parties do not challenge this determination, and this Court will give that determination deference in light of the proximity of the Bankruptcy Court to the lead bankruptcy case and its familiarity with the Bankruptcy Code. *See In re EMS Financial Services, LLC*, 491 B.R. 196, 207 (S.D.N.Y. 2013) (holding that "the decision of the bankruptcy court [as to whether action is core or non-core] is entitled to and is properly given considerable respect and deference," but that the district court is not bound that by determination); *Dailey v. First Peoples Bank of New Jersey*, 76 B.R. 963, 968 (D.N.J. 1987) ("[T]he bankruptcy code supposes that determinations of what constitutes core issues will be left to the bankruptcy court, which after all is better equipped and experienced to make such decisions . . . For these reasons, we leave to the bankruptcy court the determination of whether this matter constitutes a core issue."). Given that the Bankruptcy Court made its findings under the catchall provisions of Section 157 and the claim Oquendo asserts is one for breach of contract, the Court will briefly review that determination.

In light of the Claims and Claim Objections, this Court agrees with the Bankruptcy Court's determination. Breach of contract claims are traditionally treated as non-core claims. *See In re Coe–Truman Techs., Inc.*, 214 B.R. 183, 187 (N.D. Ill. 1997) (collecting cases). However, such claims may be considered core if they "arise[] out of the same transaction as the creditor's proof of claims . . . or [its] adjudication . . . would require consideration of issues raised by the proofs of claim . . . such that the two claims are logically related." *In re K & R Express Systems, Inc.*, 382 B.R. 443, 447 (N.D. Ill. 2007) (quoting *CDX Liquidating Trust v. Venrock Assocs.*, 2005 WL 3953895, at *2 (N.D. Ill. 2005)); *but see In re T.R. Paris & Family, Inc.*, 89 B.R. 760, 766 (Bankr. N.D. Ill. 1988) (breach of contract claims are non-core even when related to creditor's proof of claim where they could be brought independent of the bankruptcy, where no objection was filed to the proof of claim, and where the cause of action was not structured as a counterclaim). Such is the case here. Resolution of this action would not simply impact the asset pool available for distribution; rather, it would also resolve many of the Claims and Claim Objections—including all of the Claims asserted by Diaz and Global. *See* BK-ECF 110 (SRI's Claim for its share of Escrowed Funds); BK-ECF 111 (Hitz's Claim for its share of Escrowed Funds); BK-ECF 112 (Diaz's sole Claim for his share of Escrowed Funds); BK-ECF 113 (Global's sole Claim disputing allegations in the adversary action). This is further supported by the fact that the Bankruptcy Court consolidated the Claims and Claim Objections with the adversary action. As such, the flexible approach to finality applies, and no formal Rule 54(b) finding is required. *See Morse*, 805 F.2d at 264-65.

The Bankruptcy Court's grant of partial summary judgment to Oquendo constitutes a final, appealable order. *See Bach v. JPMorgan Chase Bank NA*, 2023 WL 315684, at *3 (E.D. Wis. 2023) (reviewing appeal from adversary proceeding in absence of Rule 54(b) judgment); *In re*

*Lissner Corp.*, 98 B.R. 812, 815-16 (N.D. Ill. 1989) (similar). Thus, the Court will proceed to the merits of the parties' appeals not dismissed for lack of jurisdiction.

## II. Merits of the Parties' Appeals

### A. Legal Standards

#### 1. Standards of Review

The Bankruptcy Court's legal findings are reviewed *de novo* and its factual findings are reviewed for clear error. *See In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 302 (7th Cir. 2014). As conclusions of law, decisions granting or denying motions for summary judgment under Rule 56 or to dismiss under Rule 12(b)(6) by the Bankruptcy Court are therefore reviewed *de novo*. *See id.* at 302; *Bennett v. Council 31 of the American Federation of State, County and Municipal Employees, AFL-CIO*, 991 F.3d 724, 729 (7th Cir. 2021). Decisions granting or denying motions to strike; challenges to the admissibility of evidence asserted on summary judgment; and motions to dismiss for *forum non conveniens* are reviewed for abuse of discretion. *See Continental Western Insurance Company v. Country Mutual Insurance Company*, 3 F.4th 308, 318 (7th Cir. 2021) (motion to strike affidavit); *Perez v. Staples Contract & Commercial LLC*, 31 F.4th 560, 568 (7th Cir. 2022) (admissibility of evidence on summary judgment); *Abad v. Bayer Corp.*, 563 F.3d 663, 665-66 (7th Cir. 2009) (*forum non conveniens*).

"The standards of Rule 56 of the Federal Rules of Civil Procedure apply to summary judgment in bankruptcy proceedings." *Dick v. Conseco, Inc.*, 458 F.3d 573, 577 (7th Cir. 2006). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See*

*Wesbrook v. Ulrich*, 840 F.3d 388, 391 (7th Cir. 2016); *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). "[A] court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

Pleadings and motions to dismiss filed in adversary proceedings are governed by Bankruptcy Rules 7008 and 7012, which incorporate Federal Rules of Civil Procedure 8 and 12. Under Federal Rule of Civil Procedure 8(a)(2), a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Through this statement, defendants must be provided with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This means that the complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a plaintiff "need not plead detailed factual allegations to survive a motion to dismiss, she still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016). In deciding a motion to dismiss under Federal Rule of Procedure 12(b)(6), courts must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiff's favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

**2. Breach of Contract**

Under New York law, a *prima facie* case for breach of contract requires proof of four elements: (1) the existence of a valid contract; (2) performance by one party; (3) breach by the other party; and (4) damages.[7] *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 304 (7th Cir. 2018) (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000)); *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

"Whether an agreement is ambiguous is a question of law, [which] is determined by looking within the four corners of the document." *Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1165 (2d Cir. 2024). When interpreting a contract, "the court's general objective should be to determine the intention of the parties from the language employed." *Id.* (cleaned up). Every provision of a contract must be given effect. *See Resource Group International Ltd. v. Chishti*, 91 F.4th 107, 112 (2d Cir. 2024). Additionally, a contract should be construed "in a manner that avoids inconsistencies and reasonably harmonizes its terms," *Gessin Elec. Contractors, Inc. v. 95 Wall Assocs., LLC*, 903 N.Y.S.2d 26, 28 (1st Dep't 2010), and "should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties," *Lipper Holdings v. Trident Holdings*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003).

"An ambiguous contract is one whose relevant language is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Flynn*, 120 F.4th at 1165.

[7] "[S]tate law determines the rules of contract interpretation." *North Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 652 (7th Cir. 1998); *see also Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (affirming application of state law to contract interpretation issue in an adversary action). The parties do not dispute that, pursuant to the choice-of-law provisions in the HOA and the Escrow Agreement, New York state law applies.

(internal quotation marks and citation omitted). Such an agreement "presents a question of fact which may not be resolved by the court on a motion for summary judgment." *Van Etten Oil Co., Inc. v. Aero Star Petroleum, Inc.*, 14 N.Y.S.3d 801, 803 (3d Dep't 2015) (internal quotation marks omitted).

**B. Global's Motion to Dismiss**

Global argues that the Bankruptcy Court erred in ruling at the motion-to-dismiss stage that (1) Oquendo has standing to enforce the HOA and Escrow Agreement and is entitled to the Escrowed Funds; and (2) enforcement of the forum selection clauses contained in the HOA and Escrow Agreement would be unreasonable.

**1. Failure to State a Claim**

Global appeals the Bankruptcy Court's motion-to-dismiss ruling that Oquendo has standing to enforce the Escrow Agreement. Global argues that even though Oquendo is a party to the Escrow Agreement, that agreement is inactionable because it is superseded by the HOA pursuant to the no-merger clause of Paragraph 14 of the Escrow Agreement; and Oquendo cannot enforce the HOA because it does not confer any enforcement rights on him as a third-party beneficiary. *See* ECF 16 at 25-27. Global additionally argues that Oquendo must look to POW for any payment of the Escrowed Funds pursuant to the Ratification, and POW has not sought to enforce either the Escrow Agreement or the HOA. *See* ECF 16 at 27-29. These arguments fail.

First, the Escrow Agreement is not superseded by and is actionable independent of the HOA. The no-merger clause of the Escrow Agreement provides that the Escrow Agreement does not supersede the HOA; it does not provide that the Escrow Agreement is "subject to" or "superseded" by the HOA. And the Escrow Agreement sets out rights and obligations, separate and apart from those set out by the HOA. Specifically, the Escrow Agent must disburse the

Escrowed Funds to the Oquendo Parties once certain conditions have been met; and the Oquendo Parties must follow certain procedures in order to receive the Escrowed Funds. *See, e.g.*, Escrow Agreement at ¶¶ 3, 6. Indeed, the Escrow Agreement contemplates claims separate and apart from those arising under the HOA. For example, Paragraph 9 of the Escrow Agreement indemnifies the Escrow Agent, who is not a party to the HOA, for all claims but those caused "by the gross negligence or willful default of the Escrow Agent." As such, the Escrow Agreement is actionable.

Second, and even if the parties' ability to enforce the Escrow Agreement is subject to the HOA, the language of the HOA evidences that Oquendo is an intended third-party beneficiary of the HOA. "Under New York law, a third party may enforce a contract when recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012). "[T]o succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006). To determine whether a party is an intended third-party beneficiary, a court "should consider the circumstances surrounding the transaction as well as the actual language of the contract." *Bayerische Landesbank*, 692 F.3d at 52.

Here, the purpose of the HOA was to conduct and promote the Bout, for which the services of Oquendo and Charr were indispensable; indeed, Global and POW "acknowledge[d] that [their] boxer's services as an athlete are special, unique, extraordinary, irreplaceable, and of peculiar value." HOA ¶¶ 1, 7. The HOA affords Oquendo numerous rights concerning the particulars of the Bout itself, including that: "Oquendo's locker room shall be for his exclusive use and large

enough to accommodate Oquendo [and his camp]" (HOA ¶ 3(c)); "Oquendo . . . shall have the right to use an unlimited amount of traditional soft surgical gauze . . . and an unlimited amount of traditional surgical adhesive tape required to protect [his] hands" (HOA ¶ 3(d)); "Oquendo . . . shall have the right to designate (1) member of his boxing team . . . to be present in the locker room of the other boxer to observe the wrapping of the hands of the other boxer and to inspect the gloves upon presentation by the WBA Supervisor" (HOA ¶ 3(d)); and "Oquendo shall have the right to have signage on ring apparel" (HOA ¶ 6). Additionally, "[Global] agree[d] to furnish to Oquendo" various Bout tickets and credentials for his camp, access to a local boxing gym in Cologne, and ground transportation. HOA ¶ 4. The terms of the HOA manifestly accord benefits to Oquendo.

That the parties intended the HOA to benefit Oquendo is further demonstrated by the Ratification. The Ratification provided, *inter alia*, that "in order to induce the parties to enter into [the HOA], I . . . ratify and confirm in my individual capacity all terms and conditions thereof, agree to be bound by all terms and conditions thereof[,] and agree that I shall render all services and grant all rights as are necessary to enable [Global] and POW to comply with their respective obligations under [the HOA]." The Ratification further provided that Oquendo "agree[d] to look solely to POW for full payment of any amounts due for all rights granted and services performed by me thereunder, expect with respect to any purchase as provided in Paragraph 2(a)(i) of [the HOA] which is to be paid by [Global]." Paragraph 2(a)(i) of the HOA, in turn, provided that "[Global] shall. . . pay Oquendo a purse for his participation in the Bout of $50,000." In short, Global and POW agreed to provide the services of their boxers for and to promote the Bout (and Oquendo separately agreed to provide his services), and Global agreed to pay Oquendo for his

services. As such, Oquendo has standing as a third-party beneficiary to enforce the HOA and, by extension, under Global's theory, the Escrow Agreement.

Third, Oquendo need not look to POW for payment of his share of the Escrowed Funds. Global relies on Paragraph 2(a) of the HOA—which provides that Global "shall pay POW a guaranteed fee," including the $50,000 purse and the Escrowed Funds—and Recital B of the Escrow Agreement—which acknowledges that "[t]he parties agreed that Global would place into escrow the sum of US$275,000 payable to POW under the HOA for the Bout"—to support its argument that the Escrowed Funds are to be paid to POW, not Oquendo. But other provisions of the HOA itself and provisions of the Escrow Agreement conflict with the contractual language Global cites. Paragraph 2 (a)(i) of the HOA provides that Global shall pay the $50,000 purse directly to Oquendo. *See id.* ("the net purse shall be wire transferred by [Global] to a bank account designated by Oquendo"). Furthermore, Paragraph 3 of the Escrow Agreement provides that the Escrow Agent shall transfer the Escrowed Funds directly to the Oquendo Parties. *See id.* ("The Escrow Agreement shall wire transfer the Escrowed Funds . . . to a bank account as designated by each of the . . . Oquendo Parties . . .").

A contract should be construed "in a manner that avoids inconsistencies and reasonably harmonizes its terms." *Gessin*, 903 N.Y.S.2d at 28. And "New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary." *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n. 8 (2d Cir. 1983); *see also In re AMR Corp.*, 485 B.R. 279, 302 (Bankr. S.D.N.Y. 2013) (collecting cases). As Paragraph 2(a)(i) and Paragraph 3 of the Escrow Agreement are more specific than Paragraph 2(a) of the HOA, and the Escrow Agreement was entered into subsequent to the HOA, those provisions control insofar as they conflict with Paragraph 2(a) of the HOA. The

no-merger clause of the Escrow Agreement does not save Global's interpretation. While Paragraph 14 of the Escrow Agreement provides that the Escrow Agreement does not supersede the HOA, Paragraph 10 of the HOA contemplated that the parties would "enter into a more formal agreement containing the terms and conditions hereof and such other terms and conditions as are mutually agreed." This language evidences the parties' intention to continue negotiations such that, where the HOA and the Escrow Agreement conflict, the Escrow Agreement should control. In sum, the Escrowed Funds are to be paid to the Oquendo Parties as specified by the Escrow Agreement.

Global's argument that Oquendo must look to POW for payment of the Escrowed Funds fails for similar reasons. In support of its argument, Global relies on the provision in the Ratification providing that Oquendo "agree[d] to look solely to POW for full payment of any amounts due for all rights granted and services performed by me thereunder . . . ." The plain meaning of this provision provides that Oquendo must look solely to POW for full payment of any amounts due "thereunder," *i.e.*, under *the HOA*. The HOA does not provide that Oquendo is entitled to the Escrowed Funds; that right is provided under the Escrow Agreement. Here, Oquendo performed under Paragraph 6 of the Escrow Agreement, and is claiming that Defendants, including Global, are in breach. The clause of the Ratification obligating Oquendo to look solely to POW for payments due to him *under the HOA* does not apply. And even if the Ratification can be interpreted to cover Oquendo's share of the Escrowed Funds, such an interpretation would conflict with the Escrow Agreement, which does not contain a parallel provision. The intention of the parties—as evidenced by Paragraph 10 of the HOA—mandates that that conflict be resolved in favor of the procedure outlined by the Escrow Agreement. Thus, Oquendo's claim is not barred by POW's failure to enforce the Escrow Agreement.

The Bankruptcy Court's denial of Global's motion to dismiss for failure to state a claim is affirmed.

**2. *Forum Non Conveniens***

Global appeals the Bankruptcy Court's denial of its motion to dismiss for *forum non conveniens* on the basis that enforcement of the forum selection clauses of the HOA and the Escrow Agreement would be unreasonable. Global argues that the Bankruptcy Court erred as a matter of law in finding that enforcement of the forum selection clauses would be unreasonable under the circumstances here. The HOA and the Escrow Agreement contain forum selection clauses providing that any dispute arising under the agreements brought by Oquendo against Global must be litigated in Cologne, Germany, while any dispute arising under the agreements brought by Global against Oquendo must be litigated in the United States. *See* HOA ¶ 8; Escrow Agreement ¶¶ 6, 8. Global is a German company; Oquendo is a United States citizen.

A forum selection clause is presumptively valid and should be enforced. *Jackson v. Payday Financial LLC*, 764 F.3d 765, 776 (7th Cir. 2014).[8] "The presumptive validity of a forum selection clause can be overcome if the resisting party can show it is unreasonable under the circumstances." *Id*. (cleaned up). Three sets of circumstances render a forum selection clause "unreasonable": "(1) if their incorporation into the contract was the result of fraud, undue influence or overweening bargaining power; (2) if the selected forum is so gravely difficult and inconvenient that the

[8] The Court will apply "general common law," rather than New York law pursuant to the choice of law provisions contained in the HOA and the Escrow Agreement, because the parties briefed this issue by citing cases arising under the law of various different jurisdictions. *See Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 438 (7th Cir. 2012) ("[N]either side has asked either the district judge or us to apply Mexican law to the clause; their debate over its enforceability is framed entirely as a dispute about American law, and so the issue of the applicable law has been waived."). In any event, New York law parallels federal law on this issue. *See Buffalo Naval Park Committee, Inc. v. Water Quality Insurance Syndicate*, 234 N.Y.S.3d 375, 376 (4th Dep't 2025) ("[U]nder New York law, a forum selection clause is prima facie valid and enforceable unless shown to be unreasonable, unjust, in contravention of public policy, invalid due to fraud or overreaching, or it is shown that a trial in the selected forum would be so gravely difficult that the challenging party would, for all practical purposes, be deprived of its day in court.").

complaining party will for all practical purposes be deprived of its day in court; or (3) if enforcement of the clauses would contravene a strong public policy of the forum in which the suit is brought, declared by statute or judicial decision." *Id*. (citing *M/S Bremen v. Zapata Off–Shore Co*., 407 U.S. 1, 10 (1972)); *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991)) (cleaned up). The Court will review this issue *de novo*. *See IAC/InterActiveCorp v. Roston*, 44 F.4th 635, 640 (7th Cir. 2022) (enforceability of a forum selection clause is an issue of contract interpretation that must be reviewed *de novo*).

The Court cannot find that the Bankruptcy Court's decision to deny Global's motion to dismiss for *forum non conveniens* was an abuse of discretion. First, based on Oquendo's assertion that all parties to the HOA and the Escrow Agreement are in Illinois but for Global and Oquendo's schedules filed in the lead bankruptcy action, the Bankruptcy Court found that "the selected forum is 'so gravely difficult and inconvenient' that the Debtor will be deprived of his day in court if a hearing is to be held in Germany." AD-ECF 63 at 5 (quoting *M/S Breman*, 407 U.S. at 15). In particular, the Bankruptcy Court found that Oquendo had "approximately $286,000 in secured debt, $38,958 in priority unsecured debt, and $262,885 in nonpriority unsecured debt. . . At the same time, the Debtor's gross wages, as outlined in his most recently filed schedules I and J, total $910 per month, his non-filing spouse's wages are approximately $1,641 per month, and his household expenses total about $5,292 per month . . . But for significant, regular contributions from family members and friends, the Debtor would have no ability to pay his monthly living expenses." AD-ECF 63 at 5 (citing BK-ECF 18 at 9-18). In light of these circumstances, the Bankruptcy Court did not abuse its discretion.

Second, the Bankruptcy Court found that there is a "significant public interest" in "providing Debtor with a fresh start and the opportunity to conceivably bring back to the estate a

valuable asset for the benefit of all of the Debtor's creditors." AD-ECF 63 at 5. Courts have held that, with respect to "core" bankruptcy matters, public policy favors the centralization of bankruptcy proceedings in the bankruptcy court where the debtor's bankruptcy case is pending; but with respect to "non-core" matters, forum selection clauses are enforceable to the same extent that they are enforceable outside of bankruptcy. *See In re Manchester, Inc.*, 417 B.R. 377, 384 (N.D. Tex. 2009) (collecting cases). As discussed above, this adversary action is a core proceeding, so the Bankruptcy Court did not abuse its discretion in determining that this factor supports a finding that enforcement of the forum selection clause would be unreasonable here.

As such, the Bankruptcy Court's denial of Global's motion to dismiss for *forum non conveniens* is affirmed.

**C. Oquendo's Motion to Strike and Evidentiary Objections**

Oquendo argues that the Bankruptcy Court erred in denying his motion to strike and objections to certain declarations and exhibits filed in support of Global's motion for summary judgment. In his motion to strike and brief in opposition to Global's motion for summary judgment, Oquendo objected to virtually all of the exhibits attached to the four declarations filed in support of Global's statement of facts, as well as to one of those declarations—the declaration by Patrick English (the "English Declaration")—in its entirety. Oquendo's motion to strike and his response to Global's statement of facts and brief in opposition to Global's motion for summary judgment raised identical issues and arguments, *compare* AD-ECF 118 *with* AD-ECF 146 *and* AD-ECF 147.Because the motion to strike was duplicative of the arguments Oquendo made in his response and brief, the Bankruptcy Court's denial of Oquendo's motion to strike was not an abuse of discretion. On appeal, Oquendo argues that the English Declaration: (a) does not provide proper foundation for the exhibits because it was not made on personal knowledge; (b) fails to authenticate

the exhibits; and (c) violates the advocate-witness rule. *See* ECF 25 at 51-55. In its summary judgment decision, the Bankruptcy Court overruled these objections.

First, the Bankruptcy Court overruled Oquendo's foundation and authentication objections on the basis that, at the summary judgment stage, courts consider the admissibility of the contents of the evidence, not its form; and here, the Bankruptcy Court was satisfied that the contents of most of the exhibits to which Oquendo objected could be presented in admissible form at trial. AD-ECF 173 at 10-11 (citing *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010) ("We review only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence, although the form produced at summary judgment need not be admissible."); *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (similar)). This was not an abuse of discretion. Second, the Bankruptcy Court overruled Oquendo's objections based on the advocate-witness rule because that rule is applied at trial, rather than summary judgment; any trial held by the Bankruptcy Court would be a bench trial, and the policy goals of the advocate-witness rule have little weight in such circumstances; and because it is within the court's discretion. AD-ECF 173 at 11 (citing *United States v. Jones*, 600 F.3d 847, 862 (7th Cir. 2010); *States v. Morris*, 714 F.2d 669, 672 (7th Cir. 1983)). Oquendo identifies no part of the Bankruptcy Court's reasoning that is irrational. This is further underscored by the fact that, for the reasons discussed below, the English Declaration and its exhibits are almost entirely immaterial to the legal issue put at bar by Global's motion for summary judgment.

The Bankruptcy Court's denial of Oquendo's evidentiary objections raised in his brief in opposition to Global's motion for summary judgment are affirmed.

**D. Global's Motion for Summary Judgment**

On appeal, Global argues that the Bankruptcy Court erred by finding, as a matter of law, that (a) Charr's ingestion of PED was within Global's control; (b) Global breached the HOA by failing to cause Charr to comply with the WBA's rule prohibiting the use of PED and to provide Charr's services for the Bout, and Oquendo did not breach by refusing to participate in the bout scheduled after Charr's reinstatement; and (c) Global's failure to cause Charr to comply with the WBA PED rules was not excused. Global also argues that the Bankruptcy Court erred by *sua sponte* granting summary judgment to Oquendo, instead of simply denying its motion. Oquendo argues that the Bankruptcy Court erred by finding that distribution of the Escrowed Funds, under the circumstances here, was set by Paragraph 3 of the Escrow Agreement such that he is entitled to only $196,250 of the $275,000 in Escrowed Funds. Both parties' arguments fail.

**1. Breach of Contract**

**a. Performance**

Paragraph 1 of the HOA required that Global "provid[e] the services of Charr for the Bout" and "cause Charr to comply[] with the WBA's rule prohibiting the use of performance enhancing drugs and the WBA's Fair Boxing Program that is administered by VADA with respect to the anti-doping testing for the Bout." HOA at ¶ 1. This provision "has a definite and precise meaning": Global agreed to (a) provide Charr's services for the Bout and (b) cause Charr to comply with the WBA's rule prohibiting the use of PED. *See Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014). Furthermore, the construction of this provision makes plain that the "provide services" and "cause to comply" obligations are independent: they are separated into different sentences and are not related or joined by any conjunctive or delimiting language. In other words, the "provide services" obligation is not limited

by or conditioned on the "cause to comply" obligation. Thus, if Global failed to provide Charr's services for reasons unrelated to the WBA's PED rules, but not addressed by the *force majeure* or incapacity provisions of Paragraph 5 of the HOA, Global would be in breach—for example, if Charr decided to retire from boxing altogether. Conversely, if Global failed to cause Charr to comply with the WBA's PED rules, but nevertheless provided Charr's services for the Bout, Global would be in breach—for example, if Charr participated in the Bout, but evidence later arose that Charr had used a banned PED. In the event that Global failed to either provide Charr's services or cause Charr to comply, Global's performance would either be excused under Paragraph 5 of the HOA or Paragraph 6 of the Escrow Agreement would require that the Escrowed Funds be distributed. Neither the HOA nor the Escrow Agreement contains a strict liability disclaimer.

Global argued in its summary judgment briefing that the plain meaning of the "cause to comply" clause is "nonsensical," "illogical," "absurd," "commercially unreasonable," and "contrary to the reasonable expectation[s] of the parties" because "[n]o one can guarantee the conduct of a third party." AD-ECF 102 at 9. But nothing prevented Global from agreeing to assume financial or legal responsibility for a third party's failure to perform. This is, in effect, what Global did here: it agreed to the distribution of the Escrowed Funds if Charr failed to comply with the WBA's rules prohibiting the use of PED. "The best evidence of what parties to a written agreement intend is what they say in their writing." *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010). And an "obligor who does not wish to undertake so extensive an obligation may contract for a lesser one using one of a variety of common clauses," such as "agree[ing] only to use his 'best efforts'" or "restricting his obligation to his output or requirements.'" Restatement (Second) of Contracts, Introductory Note to Chapter 11 (Am. Law Inst. 1981). Global was free at the time of contracting to agree only to use its *best* or *reasonable*

or *commercially reasonable* or *good faith efforts* to cause Charr to comply—*i.e.*, to only *try* to cause Charr to comply—but it did not. Global agreed to "cause Charr to comply[]."

In *World of Boxing LLC v. King*, 56 F. Supp. 3d 507 (S.D.N.Y. 2014), the court decided a breach of contract claim based on almost identical facts and came to the same conclusion. There, an agreement between two promoters required one promoter, King, to "cause [Jones, a boxer] to participate in a" particular bout. *Id*. at 512. Jones was disqualified from participating in the bout after testing positive for a PED banned by the WBA. *Id*. King argued that the plain meaning of the "cause to participate" clause yields "unreasonable and illogical" results as it would require of King "nothing less than . . . personal supervision of Jones's every action" or even "imprisonment" of Jones." *Id*. at 513. The court held that:

> King's efforts to paint his obligations as "ambiguous" fail. According to King, in addition to the interpretation adopted here, it is also possible to read the Agreement as requiring King to "do everything within his control and ability to cause Jones's participation." . . . But a promise to do something, and a promise to *try* to do something, are fundamentally different. The parties were free, of course, to negotiate contract terms that would only have required King to "do everything within his control and ability to cause Jones's participation." Such terms are common . . . But the terms the parties *actually* negotiated were more stringent. Under the Agreement as written, King is required to cause Jones to participate—not merely to make his best effort to cause Jones to participate. . . [T]he "cause to participate" clause "convey[s] a definite meaning" . . .

*Id*. at 512 n.38.

As such, Global agreed, and was obligated, to provide Charr's services for the Bout *and* to cause Charr to comply with the WBA's PED rules.

**b. Breach**

The relevant facts here are not in dispute: Charr tested positive for a banned PED, was suspended, and did not participate in the Bout, and the Bout did not take place as scheduled; Charr appealed the positive PED test, the WBA ruled that the test was invalid and reinstated Charr, and

the WBA and Global attempted to reschedule the Bout; and Oquendo refused to participate in the rescheduled bout. Oquendo claims that Global breached the HOA by failing to cause Charr to comply with the WBA's PED rule and to provide Charr's services for the Bout; and Global argues that POW—*i.e.*, Oquendo—breached the HOA by failing to provide Oquendo's services for the rescheduled bout. The parties do not dispute that, notwithstanding Paragraph 5 of the HOA, either promoter's failure to supply the services of its boxer constitutes a breach of the HOA.

Global argues that, because Charr's positive PED test was later found by the WBA to be invalid, there is no proof that Charr did not comply with the WBA's PED rule. *See* ECF 16 at 24-25. But "[c]ontract liability is strict liability. . . The obligor is therefore liable in damages for breach of contract even if he is without fault." Restatement (Second) of Contracts, Introductory Note to Chapter 11. Global agreed to supply Charr's services for the Bout; it failed to do so, and thus it breached the HOA, independent of whether Charr complied with the WBA's PED rule. To the extent Global argues that this interpretation of the "provide services" provision is "nonsensical," "illogical," "absurd," "commercially unreasonable," and "contrary to the reasonable expectation[s] of the parties," its argument fails for the very reason that the parties were free at the time of contracting to cede authority over the Bout to the WBA; but they did not. Thus, once Charr tested positive for a banned PED, Oquendo was "entitled to treat the [HOA] as [breached], because [Charr's] participation (which the positive test rendered impossible) was the centerpiece of the agreement." *King*, 56 F. Supp. 3d at 515.

The remaining issue, then, is whether the postponement of the Bout triggered Paragraph 5 of the HOA. To reiterate, Paragraph 5 of the HOA provides that "the WBA shall decide whether to postpone the Bout" if "the Bout is prevented from taking place by reason of any act of God, fire, flood, riot, war, public disaster or any other cause beyond the direct and immediate control of

[Global], or if Oquendo or Charr shall be or become disabled or incapacitated by reason of any physical or mental disability, injury or illness." The HOA does not address what happens if the Bout does not take place for any other reason; instead, Paragraph 10 of the HOA refers to the Escrow Agreement for "such other terms and conditions." Paragraph 6 of the Escrow Agreement provides that, "[if] the Bout . . . does not occur as currently scheduled and the Bout is not rescheduled as provided in Paragraph 5 of the HOA," the Escrowed Funds shall be returned and distributed. Thus, if Paragraph 5 was triggered, Global's performance was excused and the HOA remained in effect when the WBA sought to reschedule the Bout after Charr's reinstatement such that Oquendo breached; and if Paragraph 5 was not triggered, Global's performance was not excused.

Global argues that the HOA remained in effect pursuant to Paragraph 5 because the Bout was postponed, not cancelled, by the WBA. But the plain language of the HOA provides that not just any postponement will do; only postponements due to certain circumstances will trigger Paragraph 5. In particular, only postponements due to an "act of God, fire, flood, riot, war, public disaster or any other cause beyond the direct and immediate control of [Global], or if Oquendo or Charr shall be or become disabled or incapacitated by reason of any physical or mental disability, injury or illness" will suffice. Global argues that Charr's positive PED test constitutes a cause "beyond [its] direct and immediate control" such that the WBA had the authority to postpone the Bout, and thus the HOA remained in effect.

The Bankruptcy Court held that Global's argument was "without merit" because this issue "goes to whether its failure to perform can be excused—not whether Global actually failed to perform." AD-ECF 173 at 15. The Bankruptcy Court then found that, because Charr's positive PED test was a foreseeable event, Global's performance was not excused for impossibility. *Id.*

However, in so holding, the Bankruptcy Court conflated Global's obligation to "cause Charr to comply" under Paragraph 1 of the HOA with actions within Global's "direct and immediate control" under Paragraph 5 of the HOA. The issue Global raises centers on the distinction between those two paragraphs: in short, the difference between agreeing to cause a boxer's compliance with PED rules and whether the conduct and actions of that boxer within the promoter's direct and immediate control. In other words, even if Paragraph 1 of the HOA plainly provides that Global agreed to guarantee the outcome of Charr's conduct—*i.e.*, Charr's compliance with the WBA's PED rules—Global argues that Charr's conduct itself was not within its direct and immediate control under Paragraph 5, such that its performance under Paragraph 1 was excused. The Bankruptcy Court did not address this argument, or interpret the "direct and immediate control" clause of Paragraph 5 of the HOA independent of Global's "cause to comply" obligation under Paragraph 1. However, because both the impossibility and *force majeure* defenses require that the event excusing performance be unforeseeable at the time of contracting, the Bankruptcy Court's ultimate conclusion, though not its reasoning, is sound.

The primary purpose of *force majeure* is to "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated." *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985); *see also Constellation Energy Servs. of N.Y., Inc. v. New Water St. Corp.*, 146 A.D.3d 557, 558 (1st Dep't 2017) ("*Force majeure* clauses are to be interpreted in accord with their purpose, which is to limit damages in a case where the reasonable expectation of the parties and the performance of the contract have been frustrated by circumstances beyond the control of the parties."). "New York law requires courts to interpret *force majeure* clauses to excuse performance only for events actually named in the clause *and* of which the parties could not have

been aware when they entered the agreement." *Mitsubishi Intern. Corp. v. Interstate Chemical Corp.*, 2008 WL 4387392, at *2 n.3 (S.D.N.Y. Sept. 24, 2008) (emphasis added) (citing *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 902-903 (1987); *Macalloy Corp. v. Metallurg, Inc.*, 728 N.Y.S.2d 14, 15 (1st Dep't 2001)). Here, it cannot be said that the possibility of a positive PED test was unforeseeable. The HOA evidences that the parties foresaw the possibility of a positive PED test: Paragraph 1 of the HOA requires that the promotors cause their respective boxers to comply with the WBA's rules prohibiting the use of PEDs.

Global's argument additionally fails under basic principles of contract interpretation. The phrase "direct and immediate control" appears as an item in a list including an "act of God, fire, flood, riot, war, public disaster." Given the context of the list in which it appears, it is difficult to interpret "direct and immediate control" to mean the conduct of an independent contractor, rather than a catastrophic event such as a trade embargo. Furthermore, to the extent "direct and immediate control" can reasonably be interpreted to mean the conduct of Charr, the parties did in fact limit the scope of that clause. The subsequent sentence describes certain conduct by Charr—*i.e.*, the very conduct Global argues is beyond its "direct and immediate control"—which *would* excuse Global's performance: "if . . . Charr shall be or become disabled or incapacitated by reason of any physical or mental disability, injury or illness." Under the interpretative canon of *expressio unius est exclusion alterius*—expression of one thing is the exclusion of another—this clause must be interpreted to exclude a positive PED test from the category of Charr's conduct beyond Global's "direct and immediate control." Furthermore, by explicitly discussing the WBA's PED rule in Paragraph 1 of the HOA, but expressly listing only "disab[ility] or incapacit[y]" in Paragraph 5, the parties strongly implied that a positive PED test would not excuse performance under Paragraph 5 of the HOA. *See KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d

508, 542 (S.D.N.Y. 2020) (applying the principle of *expressio unius est exclusio alterius* to a New York contract), *aff'd*, No. 21-1263, 2022 WL 2759055 (2d Cir. July 13, 2022).

As such, Charr's positive PED test was not an event listed in the *force majeure* clause and was not unforeseeable to the parties at the time of contracting. Therefore, the parties did not cede to the WBA the authority to postpone the Bout and excuse Global's performance. Global's reliance on *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426 (S.D.N.Y. 2018) is unavailing. There, the bout agreement provided that the rules and regulations of the World Boxing Council would govern the bout in its entirety and that the World Boxing Council would exclusively perform any and all decisions and actions relating to the bout. *Id*. at 432. No such provision is contained in the HOA or the Escrow Agreement. For this same reason, Global's arguments that the parties were bound by the WBA's rulings and that the Bankruptcy Court incorrectly disregarded the administrative proceedings before the WBA fail. *See* ECF 16 at 18-24. In conclusion, Charr's positive PED test did not trigger Paragraph 5 of the HOA, and Global's performance was not excused.

**c. Excuse**

Independent of Paragraph 5 of the HOA, Global argues that the Bankruptcy Court "placed an impossible burden on Global, contrary to industry practices" because "[w]hile a contractual burden can fairly be placed on a promoter to require drug testing," "a burden cannot be placed upon it to control the unauthorized actions of a third party." ECF 16 at 29-31. "Contract liability is strict liability." Restatement (Second) of Contracts, Introductory Note to Chapter 11. However, failure to perform can be excused if "destruction of . . . the means of performance makes performance objectively impossible." *King*, 56 F. Supp. 3d at 513. Such a defense "is only available if the frustration of performance was produced by an unanticipated event that could not have been foreseen or guarded against in the contract . . . events that fall outside the sphere of what

a reasonable person would plan for." *Id*. (internal quotation marks omitted). As discussed above, the HOA evidences that the parties foresaw the possibility of a positive PED test. Global's breach is not excused for impossibility.

**2. Distribution of the Escrowed Funds**

In light of Global's breach of the HOA, Paragraph 6 of the Escrow Agreement controls, and the Court now considers the parties' arguments concerning Oquendo's entitlement to the Escrowed Funds. As discussed above, the Court affirms the Bankruptcy Court's finding as a matter of law that Oquendo is a third-party beneficiary of the HOA. Global argues that, even if Oquendo has a right to enforce the HOA and seek recovery of the Escrowed Funds, that right is limited by the fact that the Bout did not occur. To reiterate, Paragraph 2(a)(i) of the HOA provides that "[Global] shall enter into a local bout agreement with Oquendo . . . to pay Oquendo a purse for his participation in the Bout of $50,000 . . . [to be] wire[] transferred by Global to a bank account designated by Oquendo no later than the second banking day after the Bout." Global is correct: the Bout did not occur. As such, while Paragraph 2(a)(i) of the HOA evidences that Oquendo has rights and obligations under the HOA as a third-party beneficiary, that paragraph does not control the disbursement of the Escrowed Funds under the circumstances giving rise to this adversary action; for the reasons discussed above, Paragraph 6 of the Escrow Agreement controls instead.

The Court finds that Oquendo followed the procedure outlined in Paragraph 6 of the Escrow Agreement. Paragraph 6 provides that, "[i]f it is claimed that the event forcing cancellation was the responsibility of Global[,] any such claim must be made in good faith and any objection must set forth the reason it is claimed that the cancellation is the responsibility of Global. Any such contention must be made in writing within 2 days following [notification by the Escrow Agent upon its receipt (i) of the Escrowed Funds and (ii) of each request . . . by a Party for the

disbursement of Escrowed Funds].” Oquendo wrote to Global on October 18, 2018, demanding payment of his share of the Escrowed Funds. Based on the analysis above, the Court finds that his claim was made in good faith. Thus, Oquendo performed his obligations under Paragraph 6 of the Escrow Agreement and is entitled to his share of the Escrowed Funds.

Oquendo appeals the Bankruptcy Court’s finding that he is entitled to only $196,250, rather than the full $275,000, of Escrowed Funds. *See* AD-ECF 173 at 17 n. 22. Paragraph 3 of the Escrow Agreement provides that, “[u]pon the conclusion of the Bout, the Escrowed Funds shall be distributed to the Oquendo Parties upon either a) a writing from Global that the Bout has taken place or b) certification from any of the Oquendo Parties that Oquendo participated in the Bout, corroborated by a news article from Boxingscene.com that the Bout has occurred.” Paragraph 3 goes on to provide that “[t]he Escrow Agent shall wire transfer the Escrowed Funds . . . as follows”: (a) $196,250 to Oquendo; (b) $33,750 to SRI; (c) $25,000 to Hitz; (d) $20,000 to Diaz; and (e) no funds to POW. However, as discussed above, the Bout did not occur, and was cancelled. Paragraph 6 of the Escrow Agreement provides that, “[i]n such case[,] the Escrow Agent shall not disburse any of the Escrowed Funds unless and until it receives joint instruction from the Parties or a non-appealable order from a court of competent jurisdiction, at which time it shall disburse the funds to the Parties as their interests may appear.”

Oquendo argues that Paragraph 6 calls for a different distribution of the Escrowed Funds than the one outlined by Paragraph 3. In particular, Oquendo asserts that, in the absence of “joint instruction from the Parties,” the Court must determine the parties’ respective interests “under bankruptcy law.” ECF 44 at 30. As an initial matter, Oquendo’s assertion that the parties’ interests must be assessed under bankruptcy law, presumably as opposed to contract law, is baseless. The fact that Oquendo’s breach of contract claim is being litigated through an adversary proceeding as

opposed to a standalone civil action is simply the result of happenstance—namely, Oquendo's personal financial circumstances. Of course, the Claims and the Claim Objections, as creatures of bankruptcy, must be resolved "under bankruptcy law"; but Oquendo's bankruptcy petition does not alter the rights or interests of the parties under the HOA or the Escrow Agreement.

Furthermore, the implication of this argument is that those interests are not defined by and cannot be found within the Escrow Agreement, and that the phrase "as their interests may appear" may be interpreted to permit a distribution nowhere discussed in the Escrow Agreement. This position, however, conflicts with basic principles of contract interpretation, not the least of which is the four-corners rule. *See Hemad Enterprises, Inc. v. Endurance American Speciality Ins. Co.*, 308 F.R.D. 191, 194 (E.D. Wis. 2015) ("Endurance's reading [of the clause 'as their interests may appear'] would permit those interests to be defined in separate contracts of which Endurance is not a party. This would violate multiple rules of contract interpretation, not the least of which is the four corners rule. . ."). Indeed, the Escrow Agreement provides the answer in Paragraph 3. And nothing in Paragraph 6 indicates that those interests are altered or changed in the event of a cancelled Bout; instead, Paragraph 6 establishes a procedure for the distribution of the Escrowed Funds in the event of a dispute as to fault for the cancellation of the Bout so as to avoid disbursement to the party at fault. For this same reason, the Bankruptcy Court's ruling, and this Court's ruling, as to distribution is not premature: while the Escrow Agent must await a non-appealable order from a court before distributing the Escrowed Funds, the distribution itself is set by the Escrow Agreement.[9] As such, the Bankruptcy Court's finding that Oquendo is entitled to only $196,250 of the Escrowed Funds is affirmed.

---

[9] And whether this Court's order is ultimately non-appealable is up to the parties, who may either pursue a further appeal, or allow their time to appeal to lapse.

**3. *Sua Sponte* Grant of Summary Judgment**

Global argues that the Bankruptcy Court's *sua sponte* grant of summary judgment to Oquendo was procedurally improper. "While not encouraged, a district court can enter summary judgment sua sponte, or on its own motion, under certain limited circumstances." *Simpson v. Merchs. Recovery Bureau, Inc*., 171 F.3d 546, 549 (7th Cir. 1999); *see also Aviles v. Cornell Forge Co*., 183 F.3d 598, 604 (7th Cir. 1999). However, "granting summary judgment *sua sponte* warrants special caution" and generally requires that the party against whom summary judgment is entered have notice and an opportunity to present its evidence. *Simpson*, 171 F.3d at 549.

Global argues that, had it known the Court was considering granting summary judgment to Oquendo, it "would have made a proffer of evidence that the actual parties to the contract at issue[,] Global and [SRI], both considered the bout to have been postponed and not cancelled . . . Ample evidence could have been adduced on this point . . . There was no opportunity to point out the evidence in the record already or to adduce additional evidence on the point." ECF 16 at 40-41. This argument is unavailing. The Seventh Circuit has held that "[a] breach of contract claim is a double-edged sword to be advanced by a party at its own risk. Such a claim necessarily calls into question not only whether a breach occurred, but also, which party committed it." *National Inspection & Repairs, Inc. v. George S. May Intern. Co.*, 600 F.3d 878, 880 (7th Cir. 2010). And, as Global states in its opening appellate brief, "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it had that would convince a trier of fact to accept its version of events." ECF 16 at 17 (quoting *Diadenko v. Folino*, 731 F.3d 751, 757-58 (7th Cir. 2013)). In seeking summary judgment on this claim, then, Global should have marshaled all evidence in its favor in anticipation of the possibility of an unfavorable ruling. This is underscored by the fact that the central dispute here is not *whether* the underlying contract was

breached, but only *which* party breached it. In any event, for the reasons discussed above, the purported evidence Global references does not appear to raise a genuine dispute of material fact or otherwise shake the sound foundation of the Bankruptcy Court's decision—in no small part because Global already put evidence before the Bankruptcy Court to establish those very facts.

The Court does not discern any evidence or issues upon which the Bankruptcy Court's decision rested which were not fully briefed by the parties. Rather, Global itself moved for summary judgment; Global argued that there was no genuine dispute of material fact which would preclude summary judgment; and Global does not now identify any additional evidence not duplicative of that which it brought forward in its original motion. *See, e.g.*, *Jones v. Union Pacific R. Co.*, 302 F.3d 735, 740 (7th Cir. 2002) (finding that *sua sponte* grant was proper because "Jones had moved for summary judgment and marshaled all favorable evidence available in support of that motion"; "Jones does not cite to any additional evidence to add to that which he brought forward in his original motion"; "when Jones moved for summary judgment *both parties* were on notice that summary judgment was under active consideration"; and "Jones argued . . . that there were no genuine issues of material fact"). The Bankruptcy Court's *sua sponte* grant of summary judgment to Oquendo is affirmed.

**Conclusion**

Global's appeal of SRI's motion to dismiss Oquendo's bankruptcy petition and Oquendo's appeal concerning the Claims and Claim Objections are dismissed for lack of jurisdiction. The Bankruptcy Court's orders denying Oquendo's motion to strike, denying Global's motion to dismiss, denying Global's motion for summary judgment, and granting summary judgment in favor of Oquendo are affirmed.

**SO ORDERED.**

**ENTERED: September 30, 2026**



**HON. JORGE L. ALONSO**
**United States District Judge**